IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ANNE V. BRUCHESKY,

    Plaintiff,

vs.                                    CASE NO. 1:07cv57-MP/WCS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Anne V. Bruchesky, applied for disability insurance benefits. She alleges onset of disability on December 18, 2001. Her insured status expired on March 31, 2005, and she must show disability commencing after December 18, 2001, and on or before March 31, 2005.

Plaintiff was 57 years old at the time of the first administrative hearing, on March 3, 2005, and had an 11th grade education. R. 216. Plaintiff had past relevant work included as a school bus driver, assembler and quality control inspector in an electronics assembly plant (Motorola), sales clerk, and consignment sales clerk and owner. R. 219-227.

Plaintiff alleges disability due to Meniere's disease. Meniere's disease involves hearing loss, tinnitus, and vertigo resulting from nonsuppurative disease of the labyrinth of the inner ear, with edema. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.[1]

The first decision by the Administrative Law Judge was dated July 29, 2005. R. 38-44. The claim was remanded by the Appeals Council. A supplemental hearing was held on March 8, 2006. R. 244-276. The second decision of the ALJ, dated August 21, 2006, is the final decision of the Commissioner before this court for review. R. 17-24. The Administrative Law Judge found that Plaintiff could still do her past relevant work and was not disabled as defined by Social Security law.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

---

[1] DORLAND'S ILLUSTRATED MEDICAL DICTIONARY is available at: http://www.mercksource.com (Medical Dictionary link).

Case No. 1:07cv57-MP/WCS

1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted). The court must give "substantial deference to the Commissioner's decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' " Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

     A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the Administrative Hearing**

Plaintiff testified at the first administrative hearing that she was diagnosed in 2001 as having Meniere's disease, which causes an increase of fluid in the inner ear,

creating pressure and an attack of vertigo.  R. 232.  She said that during an attack, she suffers from inability to focus (seeing double or triple), dizziness, and nausea.  R. 228, 232.

Plaintiff said that the attacks were sudden, mostly without warning.  R. 229.  On the rare occasion when there was warning, the warning was only a second or so.  R. 230.

She said she must close her eyes to reduce the nausea from an episode.  R. 228-229.  She loses her balance.  R. 229.  She said that the attacks last from two to twelve hours, and occur one to three times a month.  *Id.*  A mild attack lasts only a few hours.  R. 230.  Plaintiff said that when she has an attack, she has to go to bed and she must lie still.  R. 235.  She can do nothing at all during an attack.  R. 236.

Between attacks of vertigo, Plaintiff said that she is a normal person capable of doing work.  *Id.*  She can lift, sit, stand, and walk without impairment.  R. 237.

Plaintiff said that when an attack occurs, the symptoms depart gradually.  R. 231.  After an attack, she feels weak and lacks motivation.  *Id.*  After a twelve hour attack, she said, she needs two days in bed to recover.  R. 236.

Plaintiff said that despite medical treatment, nothing has lessened the frequency or severity of the attacks.  R. 236. Plaintiff said that she takes a diuretic to help reduce the fluid, but it did not seem to help; she still has attacks.  R. 232.  She takes meclizine[2] for nausea and vomiting.  *Id.*  She said that meclizine sometimes keeps her from

---

[2] Meclizine hydrochloride is an antihistamine used in the management of nausea, vomiting, and dizziness associated with motion sickness and of vertigo associated with disease affecting the vestibular system; administered orally.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

vomiting, but the dizzy spell still must run its course. R. 238. Plaintiff said that Prednisone[3] stops the attacks for a month or two. R. 238-239. But she said that because it is a steroid, her physician will not allow her to use it constantly. R. 238.

Plaintiff said that she drives about once a week, but does not drive more frequently because of her attacks of vertigo. R. 218-219. She last worked in December, 2000, driving a school bus, and she left that job because she was having frequent attacks of vertigo. R. 219. Plaintiff said that if she had an attack of vertigo while working as a cashier, she would have to stop work immediately. R. 239. She would not be able to keep her eyes open. *Id*.

Plaintiff's testimony at the second hearing, on March 8, 2006, is much like that at the first hearing. She said that when she has an attack of vertigo, she has nausea, vomiting, dizziness, and loss of balance. R. 253. She has to close her eyes to reduce the nausea. *Id*. Attacks last two to twelve hours, the symptoms subside slowly, and recovery afterwards may take a day or two. R. 254. She said she had an attack while driving the school bus, and does not know how she got the bus parked, but she had to quit that job immediately because "it's too dangerous now." R. 255. She had driven to the post office a couple of times on her own the year before. R. 256. She said that she had had these attacks while driving. *Id*.

Plaintiff said that she recorded the attacks on a calendar. R. 256. She said she had attacks one to three times per month. *Id*. She recorded 28 attacks in 2005. R.

---

[3] Prednisone is a synthetic glucocorticoid derived from cortisone, administered orally as an antiinflammatory and immunosuppressant in a wide variety of disorders. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

256-257.  She had 14 attacks in the month of August alone.  R. 257.  She said that 2005 was the worst year.  R. 259.  She thought that she had had at least 15 to 20 attacks in 2004.  *Id*.  The longest she went between attacks in 2005 was three months.  R. 257.

When asked if the attacks were "immobilizing," she repeated that she had to lie down and close her eyes.  *Id*.  She said that the feeling of nausea was intensified if she did not close her eyes.  R. 258.  She said:

> I try to lay still or be very quiet, because any movement of myself
> intensifies it, also, makes me, makes me want to throw up if, if I move.
> So, I, I lay very still, as still as I can, until it passes.

R. 260.  Plaintiff said that she lacked balance when an attack occurs.  R. 262.  "I've walked into walls trying to go to the bathroom."  *Id*.  During all 28 of the episodes of vertigo in 2005, Plaintiff said that she experienced double vision, nausea, vomiting, and imbalance.  R. 262-263.

Plaintiff said that she was given MRI scans to determine whether she had a brain tumor since a brain tumor could have produced the same symptoms.  R. 259.  Since there was no brain tumor, the diagnosis was Meniere's disease.  *Id*.

The vocational expert testified that if Plaintiff's testimony were found to be credible, she would not be able to work.  The expert said that having to lie down and close her eyes "on an untimely basis beyond reasonable breaks, that would pretty well preclude ability to sustain competitive employment . . . ."  R. 271.  The expert said that chronically or repetitively exceeding three absences a month would lead to corrective action or termination.  R. 272.  He said that chronic absences would not be tolerated on an assembly line.  R. 273.  The expert said that missing 5 to 10 days a year is "pretty

standard," but missing 15 workdays a year would be considered by an employer to be excessive. R. 273-274.

As Plaintiff's attorney explained at the second hearing,

> it's one of those chronic problems that, that comes in waves, and it's the frequency of these attacks and the duration over, you know, over the year or over the months, that keep her from working. While she may be able to engage in employment for a few months, she's going to have that month or a period of months, where she's going to miss so much time and be incapacitated to the point where she's not going to be able to be reliable to an employer.

R. 247. He argued that Plaintiff does not go to the doctor every time she has an attack, but she keeps a record of them. R. 274.

**Medical Evidence**

Plaintiff was seen in the emergency room on December 27, 2001, for a recurrent episode of severe vertigo. R. 152. She had gone to see Dr. Gershow, but had an attack and began vomiting in his office. *Id.* The treating physician, Dr. Stefanie B. Lord, found that aspects were suggestive of Meniere's disease. R. 153. Plaintiff was given Phenergan[4] and Antivert[5] "with good relief of her nausea and vertigo." *Id.*

---

[4] Phenergan is a trademark for promethazine hydrochloride, which is a phenothiazine derivative having marked antihistaminic activity as well as sedative and antiemetic actions; used to provide bedtime, surgical, and obstetrical sedation, to potentiate the action of central depressants, to treat allergic conditions including rhinitis, conjunctivitis, and pruritic skin disorders, to manage nausea, vomiting, and vertigo associated with surgery, pregnancy, and motion sickness, and as an ingredient in cough and cold preparations; administered orally, rectally, intramuscularly, and intravenously. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[5] Antivert is a trademark for preparations of meclizine hydrochloride. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

On December 28, 2001, she was seen by her treating physician. R. 159. She reported that in the last three weeks, she had been having a severe episode of vertigo every five to ten days. *Id*. She said that meclizine had not helped during acute spells. *Id*. It was reported that Astelin[6] sprays had helped. *Id*. She was still acutely ill, and movement exacerbated her symptoms. *Id*. Prednisone "tapering down slowly" was prescribed. *Id*.

On July 24, 2002, it was reported that Prednisone "seems to have relieved" her attacks. R. 157. The treating physician recommended using meclizine "to break an attack." *Id*.

On July 16, 2003, it was noted by Plaintiff's treating physician that she had "been having a pretty rough course the past several months." R. 157. She had been having recurrent vertigo attacks. *Id*. An audiogram show significant hearing loss compared to the last test. *Id*. Dyazide,[7] Valium, meclizine, and a "tapering course of steroids" were prescribed, with return in another month. *Id*.

On August 14, 2003, Plaintiff reported that her dizziness was significantly under better control with oral steroids. R. 156. She reported that over the past weekend, she felt like she was having another attack and quickly took meclizine, "which stopped it." *Id*. The treating physician prescribed Dyazide, Astelin, meclizine, and another round of

---

[6] Astelin is a trademark for a preparation of azelastine hydrochloride. Azelastine hydrochloride is an antihistamine. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

[7] Dyazide is a trademark for preparations of triamterene with hydrochlorothiazide, a diuretic. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

steroids. *Id.* The physician, Dr. Yoon Nofsinger,[8] said that he would "fill out paper work for her regarding disability." *Id.* A physician's statement as to "disability" does not appear to be in this record.

On February 17, 2004, there is a note that Plaintiff was seen by a treating physician or staff. R. 187. It was noted that her Meniere's disease "is really bad. She has 1-3 attacks a month. Lasts 6-12 [hours]." *Id.*

On April 1, 2004, Plaintiff was seen by Dr. Nofsinger. R. 190. Plaintiff reported significant improvement of vertigo since being on Prednisone. *Id.* After coming off Prednisone she had a "brief episode of feeling unwell." *Id.* The diagnosis was Meniere's disease "which is [sic] progressively worsened." *Id.* A low dose of Prednisone was recommended. *Id.*

On June 14, 2004, it was noted that she had not had episodes of vertigo. R. 190. Prednisone in decreasing levels for three months was prescribed. *Id.*

On September 14, 2004, it was noted that her condition was "relatively stable. No real problems." R. 189. She was to stay "on her Dyazide and use the meclizine as needed." *Id.*

Plaintiff's last insured date was March 31, 2005. On September 30, 2005, Plaintiff was seen by Jeremy S. Melker, M.D. R. 210. Dr. Melker wrote:

> At the time of her initial evaluation in early September her vertigo had become essentially incapacitating despite compliance with Dyazide and her serial audiometry had demonstrated a marked decrease in her discrimination scores. We had a lengthy discussion at that point regarding

---

[8] The physician's initials, YCN, R. 156, would correlate with Dr. Yoon Nofsinger. R. 208.

> treatment options for Meniere's disease and we opted to try Neptazane [9] as a first step.
>
> Of note, the patient began Neptazane on September 13, and since that time [17 days] has had only 2 episodes of vertigo, neither of which even put her in bed. She has not, however, noted any change in her hearing or her tinnitus.

R. 210. Dr. Melker ordered another MRI. *Id*. He concluded that she was "[c]urrently doing very well on once daily Neptazane. For now patient will simply journal symptoms going forward." R. 211. Her allergic rhinitis was currently asymptomatic. *Id*.

On March 10, 2006, Dr. Melker wrote a letter to an attorney, Bartholomew C. Zadel. R. 208. Dr. Melker said that Plaintiff was diagnosed with Meniere's disease in 2001, and "apparently did well on Dyazide though the patient's treatment records from this time were unfortunately destroyed in Hurricane Frances." *Id*. Dr. Melker then said:

> In May of 2005 she saw another of my partners, Dr. James Gershow, and was given a scopolamine patch for what was then a flare of vertiginous symptoms during the spring months which seemed to be exacerbated by concomitant difficulties with allergic rhinitis. Again, this is by chart review of my partner's note. The patient subsequently first came under my care in September 2005 at which time she had had progressive difficulties with what had become essentially incapacitating vertigo despite compliance with her medications and a low salt diet which is recommended for patients with Meniere's. At the time of that visit, I switched her to second line pharmacotherapy, that being Neptazane. A new MRI was also obtained given a progression in her hearing loss, which again demonstrated no evidence of acoustic neuroma or other intracranial abnormality. Moreover, at the time of follow-up on September 30 her vertigo had significantly improved with only 2 interval bouts since her initial evaluation with myself.

---

[9] Neptazane is a trademark for a preparation of methazolamide. Methazolamide is an antihistamine derived from phenothiazine, having sedative and antimuscarinic effects; used in the symptomatic treatment of hypersensitivity reactions, particularly pruritic dermatoses; administered orally. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY.

> The patient is scheduled to return to see me on March 31[, 2006]. Her only interval interaction with our office has been a telephone encounter on 10-12-2005 for a refill of once daily dosed Neptazane. *As I had specifically instructed her to contact me if her symptoms worsened such that we might escalate her Neptazane dosing, it is my impression that her vertigo has now been essentially controlled with this medication.*

R. 208-209 (emphasis added).

**Legal Analysis**

**Whether the ALJ erred in failing to find at step 2 that Plaintiff's Meniere's disease was not a "severe" impairment**

Plaintiff contends that the ALJ should have found at step 2 that Plaintiff's Meniere's disease was a "severe" impairment. Doc. 13, p. 9. He did in the second decision, which is the only decision before this court for review. R. 23. The premise of this claim is unsupported.

**Whether the reasons give by the ALJ to discredit Plaintiff's testimony as to the severity of her impairment are supported by substantial evidence in the record**

Pain and other symptoms reasonably attributed to a medically determinable impairment are relevant evidence for determining residual functional capacity. Social Security Ruling 96-8p, p. 4. Pain and other symptoms may affect either exertional or non-exertional capacity, or both. *Id.*, p. 6.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law,

that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for disregarding the claimant's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's pain standard if his findings "leave no doubt as to the appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

There is no dispute that Plaintiff has an underlying medical condition that could give rise to disability.  It is also without dispute that when Plaintiff suffers a severe attack of vertigo and nausea, she vomits, loses her balance, sees double, and she must lie down for an extended time with her eyes closed.  It is therefore undisputed that when this occurs, Plaintiff cannot do any form of work.

The issue, as aptly stated by Plaintiff's attorney at the hearing, is whether Plaintiff's condition recurs so frequently, causing three or more absences per month, or more than 15 absences a year, such that she could not do any form of work.  Stated another way, the issue is whether there is substantial evidence in the record to conclude that Plaintiff's condition can be and has been adequately controlled by treatment.

The Administrative Law Judge found that prior to March 31, 2005, Plaintiff's "allegations of severe symptoms and limitations are not fully persuasive and her statements are inconsistent and not supported by the medical evidence of record when compared to her activities of daily living and the progress notes from her former treating specialists . . . ."  R. 22.

The ALJ noted that Plaintiff can drive short periods of time on good days, and takes care of her personal needs, cooks, does household chores, laundry, and shopping.  R. 22.  These "activities of daily living" are not substantial evidence in the record to discount Plaintiff's testimony.  Plaintiff said she was not disabled at all when she was not having an episode of vertigo.  Of course she can function well when an episode is not occurring.  The evidence of her daily activities, as discussed by the ALJ, says nothing about the frequency of the episodes.  As the vocational expert pointed out, the issue is whether the episodes were so frequent that Plaintiff would not be employable.

The progress notes from Plaintiff's treating physicians were thoroughly discussed by the ALJ.  R. 19-20.  He concluded that Plaintiff

> had good response to conservative treatment and low sodium diet without the need for multiple emergency room treatments, hospitalizations, surgery and/or any other aggressive modalities.  Her treating specialist's notes as well as her statements indicated significant improvement in her symptomatology with the prescribed medications. . . .  [H]er overall symptoms responded relatively well with oral steroids . . . .

R. 20.

These findings are supported by substantial evidence in the record.   Plaintiff testified that she could not take Prednisone for any extended length of time because it is a steroid. But Plaintiff's course of treatment with Prednisone does not appear to have been extended, and, as Plaintiff testified, Prednisone provided good relief.  It was found that Prednisone had provided relief on July 24, 2002.  R. 157.  She was found to have had a "pretty rough course" a year later, on July 16, 2003, and a tapering course of Prednisone was ordered.  R. 157.  By August 14, 2003, Plaintiff reported that

Prednisone had brought her dizziness under significantly better control, and she had been able to stop an attack with meclizine. R. 156. Another round of Prednisone was ordered. *Id.* On February 17, 2004, it was noted that Plaintiff's Meniere's disease had been "really bad," with one to three attacks per month. R. 187. This is consistent with Plaintiff's testimony. But by April 1, 2004, Plaintiff reported to Dr. Nofsinger that she had had significant improvement of vertigo since being on Prednisone. R. 190. A low dose of Prednisone was prescribed. *Id.* On June 14, 2004, it was noted that she had had no episodes of vertigo. R. 190. On September 14, 2004, it was noted that her condition was "relatively stable. No real problems." R. 189.

Plaintiff's insured status expired on March 31, 2005. Plaintiff's testimony, that she had 14 attacks in the month of August, 2005, after the expiration of her insured status, is corroborated by the notes from Dr. Melker. He said she was incapacitated when she came to him for treatment in early September, 2005.[10] R. 210. But thereafter, Plaintiff's condition was well-controlled by Neptazane. R. 211. By March 10, 2006, Plaintiff's treating physician, Dr. Melker concluded:

> As I had specifically instructed her to contact me if her symptoms
> worsened such that we might escalate her Neptazane dosing, it is my

---

[10] Oddly, the Administrative Law Judge seems to have rejected the portion of Dr. Melker's opinion about the incapacitating episodes shortly before he first saw Plaintiff, in early September, 2005, yet he fully credited Dr. Melker's opinion that Plaintiff's disease was well-controlled with Neptazane after September, 2005. R. 21. The ALJ refers to "this opinion," which must mean the opinion concerning the incapacitating character of Plaintiff's episodes. *Id.* This was error. There is nothing contradictory about the opinion and the evidence. Dr. Melker was referring to Plaintiff's condition in early September, 2005, which would have had reference to the immediately preceding weeks, that is, in August, 2005. It was not a reference to Plaintiff's condition prior to March 31, 2005, when her insured status expired.

impression that her vertigo has now been essentially controlled with this medication.

R. 209.  This is substantial evidence in the record for the conclusion reached by the Administrative Law Judge, that although Plaintiff's bouts with vertigo are incapacitating when they occur, the condition is now controlled with Neptazane, and was controlled with Prednisone prior to March 31, 2005, such that the frequency of the attacks would not preclude gainful employment.  While Plaintiff probably could not return to work as a school bus driver, due to the suddenness of her attacks of vertigo, there is substantial evidence in the record to conclude that she could return to her other past relevant work.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge correctly followed the law and are based upon substantial evidence in the record.  The decision of the Commissioner should be affirmed.  Accordingly, it is **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on November 7, 2007.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 1:07cv57-MP/WCS